1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CHRISTOPHER HOWARD JONES,

11                  Petitioner,                 No. 2:10-cv-3154 KJM JFM (HC)

12        vs.

13   RAUL LOPEZ,

14                  Respondent.             FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner, a state prisoner, proceeds pro se with a petition for writ of habeas

17   corpus filed pursuant to 28 U.S.C. § 2254.  At issue are his 2004 convictions for robbery,

18   burglary, and murder in the San Joaquin County Superior Court, case number SF087852B.

19                              BACKGROUND

20            The California Court of Appeal, Third Appellate District, summarized the facts

21   underlying the convictions at issue here.  Petitioner is the defendant referred to herein:

22            The victims, Kevin and Sabrina Dahnke, were found shot to death
             in their home in Lodi.  Two handguns, a .44 caliber and a .38
23           caliber, were involved in the incident.

24           Investigators were soon contacted by Scott F., who told them that
             defendants [Christopher Howard Jones and Joel Magana] might
25           have been involved in the killings.  Kevin was a known marijuana
             dealer.  According to Scott, Kevin had threatened to "jack" a friend
26           who also sold marijuana.  Several people, including Scott and

1

defendant Magana, had talked about making a preemtive move, and Magana said he could get guns.

The direct targets of the alleged "jack" soon dropped their plans, but Magana told Scott that he had obtained guns. A day or two later, Magana approached Scott to ask if he was interested in following through on the original plan. When Scott declined, Magana said he would "get [defendant] to do it with him." Magana and defendant were good friends who were "always together." They both worked the night shift at Wal-Mart.

Two days before the murder, Scott went to defendant's apartment and found defendant and Magana in a bedroom, looking at a .44 caliber and a .38 caliber handgun.

On the night of the murder, Magana called Scott and asked him to meet Magana outside. The two talked on the walkway between their apartments. Magana said he was "going to go shoot Kevin and Sabrina," and he showed Scott some potatoes that he said he was going to put on the barrel of the gun. Scott told him there was "no chance of just robbing them, that he was going to have to kill him. Magana responded, "[H]e's already dead."

During this conversation, defendant was sitting in the passenger's seat of Magana's car.

Magana told a friend that he and defendant were going to be going to work about one hour late.

Magana and defendant drove to the victims' home. At about 11:00 p.m., neighbors of the victims heard gunshots. They did not see anyone, but saw a car matching Magana's parked car in the victims' driveway.

Defendant and Magana drove to the home of defendant's sister in Pittsburg, California. Her fiancé had a reputation as a "gang banger" who sold drugs and arms. Magana called his employer from Pittsburg and told him that he and defendant were going to be late due to car problems. Neither made it to work that night. Defendant and Magana eventually drove home.

The next morning, a neighbor discovered the victims' bodies. Kevin had been shot four or five times. Sabrina had been shot three times, including once at very close range. A piece of potato was found on the couch.

The same morning, Magana went over to Scott's apartment. Magana was limping and had a large bag of marijuana that he said he had gotten from Kevin. Scott noticed a small amount of blood behind Magana's ear.

1          Later that day, Scott contacted the police.

2          Officers arrested defendant and Magana.  Testing revealed that
           both men had small amounts of gunshot residue on their hands.
3
           Large quantities of marijuana were found in defendant's apartment
4          and that of Magana.  Officers found clothing in a dumpster outside
           Magana's apartment complex.  Bloodstains on a jacket matched
5          Kevin's genetic profile; bloodstains on a pair of tennis shoes
           matched Sabrina's.  This clothing had been worn by Magana.  A
6          bloodstain on the passenger's seat of Magana's car also matched
           Sabrina's genetic profile.
7
           Defendant and Magana were both charged with two counts of
8          murder, robbery, burglary, and conspiracy to commit these crimes.
           The information also alleged various firearm enhancements and
9          special allegations.

10         The prosecution theorized that both defendants had been involved
           in the shootings, each using a different gun.
11
           Defendant did not testify at trial but argued that he had not been
12         involved in these events.  Instead, he suggested that Magana had
           committed the crimes with Scott or the dealer Kevin was allegedly
13         about to "jack."

14         Magana testified at trial and placed all responsibility for the
           murders on defendant.  He denied shooting either Kevin or
15         Sabrina, and said he had gone with defendant to Kevin's house
           simply to buy marijuana.  He was taken completely by surprise
16         when defendant pulled out a weapon and shot Kevin.  He said
           Kevin lunged toward him and as the two grappled, Sabrina entered
17         the room and threw something at Magana.  The two men fell to the
           floor, and Magana heard several more gunshots.
18
           Magana said he fled the scene and drove away, but came back for
19         defendant, who then held a gun on him and ordered him to drive to
           Pittsburgh.  Magana said he handled the guns when he got them
20         out of the car.

21   *People v. Jones*, No. C048432, Respondent's Ex. A ("Ex. A") at 3-6.

22          A jury convicted petitioner of robbery, burglary, and two counts of murder, and

23   found true various charged firearm enhancements and special circumstances.  Ex. A at 1.  The

24   trial court sentenced him to state prison for an aggregate sentence of 56 years to life plus two

25   consecutive life sentences without the possibility of parole.  *Id.*

26   /////

3

1          In an unpublished opinion on direct review, the California Court of Appeal,

2    Third Appellate District, held that the trial court erred in failing to conduct the inquiry required

3    under *People v. Marsden*, 2 Cal.3d 118 (1970)[1] and remanded the case to the trial court with

4    directions to conduct a hearing allowing petitioner to explain the reasons why he requested the

5    appointment of new counsel. Ex. A at 40. If good cause was shown, the trial court was to

6    appoint new counsel and set the case for retrial; if good cause was not shown, the trial court was

7    to reinstate the judgment. *Id*. The trial court held a *Marsden* hearing, concluded that petitioner

8    did not show good cause for the appointment of new counsel, and reinstated the judgment.

9    Respondent's Exhibit B ("Ex. B") at 2. Petitioner unsuccessfully appealed the denial of his

10   *Marsden* motion to the California Court of Appeal. Ex. B. He presented two petitions for

11   review to the California Supreme Court which were likewise denied. Lodged Documents ("LD")

12   6-7 and 13-14. The parties agree that petitioner has exhausted state court remedies on grounds

13   presented.

14                                    ANALYSIS

15   I.  Standards for a Writ of Habeas Corpus

16          Federal habeas corpus relief is not available for any claim decided on the merits in

17   state court proceedings unless the state court's adjudication of the claim:

18          (1) resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established Federal law, as
19          determined by the Supreme Court of the United States; or

20          (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
21          State court proceeding.

22   28 U.S.C. § 2254(d).

23

24          [1] Pursuant to *People v. Marsden*, 2 Cal. 3rd 118 (1970), when a criminal defendant in
     California seeks to discharge appointed counsel and substitute another attorney on the basis of
25   alleged inadequate representation, the trial court must permit him to explain the basis of his
     contention and to relate specific instances of the attorney's inadequate performance. *People v.
26   Memro*, 11 Cal.4th 786, 857 (1995) (quoting *People v. Fierro*, 1 Cal.4th 173, 204 (1991)).

1        Under section 2254(d)(1), a state court decision is "contrary to" clearly

2  established United States Supreme Court precedents if it applies a rule that contradicts the

3  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

4  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

5  result.  *Early v. Packer*, 537 U.S. 3, 7 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-406

6  (2000)).

7        Under the  "unreasonable application" clause of section 2254(d)(1), a federal

8  habeas court may grant the writ if the state court identifies the correct governing legal principle

9  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

10  prisoner's case.  *Williams*, 529 U.S. at 413.  A federal habeas court "may not issue the writ

11  simply because that court concludes in its independent judgment that the relevant state-court

12  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

13  application must also be unreasonable."  *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75

14  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

15  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

16        The court looks to the last reasoned state court decision as the basis for the state

17  court judgment.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Under AEDPA, a state

18  court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption

19  by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Ybarra v. McDaniel*, 656 F.3d 984,

20  989 (9th Cir. 2011).

21  II.  Analysis of Petitioner's Claims

22        A.    *Batson-Wheeler* Motion

23        After the prosecutor excused T.M., the sole African-American prospective juror,

24  petitioner objected pursuant to *People v. Wheeler*, 22 Cal.3d 258 (1978), that the peremptory

25  challenge was improperly motivated by race.  On appeal, the California Court of Appeal, Third

26  District, found the following facts:

In her juror questionnaire, T.M. stated she was 33 years old and had an A.A. degree. She worked in hotel special services for Marriott Worldwide Reservations, performing a number of different duties. She responded "N/A" to q question asking whether she rented or owned her residence, and "N/A" to a question asking about the employment history of other adults with whom she resided.

T.M. had no opinions about criminal defense attorneys or prosecutors. She had no prior jury experience, and no law enforcement contacts. However, her brother had been convicted of a drug possession charge and had been placed on probation. T.M. was "unsure" of the details of this offense, but believed her brother was treated fairly. She did not think her brother's situation would have affected her judgment in this case.

T.M. agreed with the legal principles set forth in the questionnaire, and indicated she would apply the same standards for assessing witness credibility to peace officers and other witnesses. One question asked, "Do you believe that it is possible that a defendant charged with a crime might not tell the truth?" but T.M. left this question blank. However, in response to another question, she indicated that she believed that it was possible for any witness to tell the truth and yet lie under oath. She explained: "There are a number of reasons why I feel this way. I feel that there are some people who do not take the oath in a serious manner." She thought she was a good judge of credibility, noting that she was well rounded, well traveled, open minded, and experienced in dealing with many types of people.

In response to questioning by one defense attorney, T.M. said she "absolutely" could be fair, reiterating that she was well rounded and weighed everything out "as far as making any decisions." She said she would not give more weight to a police officer's testimony, and agreed that officers could make mistakes just like anyone else.

After asking general questions of the entire venire, the prosecutor followed up by asking T.M. about several of her responses. She had received three tickets for speeding and said she deserved them all. T.M. had testified in deposition and trial in a case she had brought against an employer after a "run-in." She said she had been confident about her case, but had been nervous reliving the experience and testifying in front of people she did not know. T.M. affirmed that she could return a guilty verdict if the prosecutor met his burden of proof.

During the second round of peremptory challenges, the prosecutor exercised a peremptory challenge against T.M., and defense counsel objected, citing *Wheeler*.

At the ensuing hearing, the court noted that T.M. was the only black juror in the jury box, and found defendant had established a prima facie case of discrimination.  The court asked the prosecutor to explain his challenge.

The prosecutor responded that he did not know T.M.'s ethnicity when he reviewed her questionnaire but some of her responses had given him concern.  He noted that T.M. had responded "N/A" when asked whether she rented or owned her residence, which indicated to the prosecutor that T.M. "probably still lives with her parents and she is 31 [*sic*] years old.  So I had concerns about taking grown-up responsibilities with that answer."

The prosecutor pointed out that T.M.'s brother had been convicted for drug possession, and this case involved drug use.  He said he was concerned "about her ability to be fair based on her family history."  He added that "after having that concern, I got to the packet on witness credibility where she didn't answer, if you believe it's possible the defendant charged with a crime might not tell the truth.  And I didn't see any other questions that she had missed."

The prosecutor then added, "[L]astly, when we were asking her questions, she said that she had sued her employer and taken her case to trial.  My feelings, this would cause her to have a natural empathy with people who want to take their cases all the way through trial. [¶] And probably more of anything, based on- based on that concern about her taking her own case in suing an employer and gong all the way through trial, I just didn't feel that she would be the best juror for my case."

Defense counsel responded to these explanations, but the trial court concluded that the prosecutor acted properly in excusing T.M.  The court stated, "A peremptory challenge does not have to rise to the level of a challenge for cause.  The question in a *Wheeler* motion is whether or not the challenge was made for racial reasons... [I]f a juror has a relative who's been arrested and convicted for other matters, that is a legitimate reason for the prosecutor to excuse the juror.  I accept [the prosecutor's] explanation and I think that it is a race neutral reason."

*People v. Jones*, 2007 WL 2470096 at 10-11.

The state appellate court rejected petitioner's claim of error, holding:

The prosecutor offered valid, nondiscriminatory reasons for exercising a peremptory challenge against T.M., most notably (1) T.M.'s litigation against her employer and perceived "empathy with people who want to take their cases all the way through trial," and (2) her brother's conviction for drug possession.  We defer to

the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.]

Defendant contends that other jurors had relatives with criminal histories, failed to answer all questions on the questionnaire, or had issues with their employer. Even if we assume that a comparative juror analysis is appropriate, defendant does not identify anyone who expressed responses similar to T.M.'s on all of these topics. [Citation.] While some of the seated jurors shared one or another of the characteristics exhibited by T.M., none shared the same constellation of traits. None had both a relative with a drug-related conviction *and* had taken a complaint against his or her employer to trial.

Defendant suggests that the prosecutor should have asked questions of T.M. to clear up any concerns about her living situation. While we agree such questioning might have been helpful, defendant cites no authority to support his belief that the prosecutor was required to engage in such a dialogue before exercising a legitimate peremptory challenge.

In short, defendant's claims under *Batson-Wheeler* are not persuasive. Substantial evidence supports the trial court's determination that the prosecutor properly exercised his peremptory challenge to excuse T.M.

Ex. A at 24-25.

The Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the basis of race. *Batson v. Kentucky*, 476 U.S. 79 (1986). *People v. Wheeler* is "the California counterpart to *Batson*" (*Yee v. Duncan*, 463 F.3d 893, 896 (9th Cir. 2006)); however, the standards of *Batson* control this court's disposition of the case. *Lewis v. Lewis*, 321 F.3d 824, 827 & n.5 (9th Cir. 2003).[2]

When a defendant asserts that a prosecutor's peremptory challenge is racially-motivated, a trial court applies a three-step process to evaluate the *Batson* claim. *See Hernandez v. New York*, 500 U.S. 353, 367 (1991). First, the defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. *Batson*, 476 U.S. at

---

[2] Petitioner's *Wheeler* motion preserved his federal constitutional claim because a *Wheeler* motion serves as an implicit *Batson* objection. *See Boyd v. Newland*, 467 F.3d 1139, 1142 n. 2 (9th Cir. 2006).

96-97.  Once a prima facie case is established, the burden shifts to the state to articulate a race-neutral explanation for the challenge.  *Id*. at 97.  In the third and final step, the trial court must determine whether the defendant carried his ultimate burden of proving purposeful discrimination by evaluating the prosecutor's reasons and making a credibility determination.  *McClain*, 217 F.3d at 1220 (quoting *Hernandez*, 500 U.S. at 359); *see also Batson*, 476 U.S. at 98.[3]

An en banc panel of the Ninth Circuit discussed the requirements of a court in analyzing the third step of a *Batson* issue:

> At this stage, "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768.  Although the burden remains with the defendant to show purposeful discrimination, the third step of *Batson* primarily involves the trier of fact.  After the prosecution puts forward a race-neutral reason, the court is required to evaluate "the persuasiveness of the justification." *Id.* To accept a prosecutor's stated reason, the court need not agree with them.  The question is not whether the stated reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed2d 395 (1991) (plurality opinion).  "It is true that peremptories are often the subjects of instinct," and that "it can sometimes be hard to say what the reason is." *Miller-El*, 125 S.Ct. at 2332.  "But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Id.* "While subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination..." *Burks v. Borg*, 27 F.3d 1425, 1429 (9th Cir. 1994).

> The trier of fact may not turn a blind eye to purposeful discrimination obscured by race-neutral excuses.  "[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges. *Batson*,

---

[3] Where, as here, the trial court ruled on the ultimate question of intentional discrimination, the preliminary question of whether the defendant made a prima facie need not be addressed.  *See Collins v. Rice*, 365 F.3d 667, 677 n.6 (9th Cir. 2004) (overruled on other grounds) (citing *Hernandez v. New York*, 500 U.S. 352, 359 (1991)).  In addition, because the prosecutor in this case offered race-neutral reasons in order to meet his burden at the second step of the analysis, this court should proceed directly to an analysis of the third step.

476 U.S. at 98 n.20 (quoting *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).  "A *Batson* challenge does not call for a mere exercise in thinking up any rational basis." *Miller-El*, 125 S.Ct. at 2332.  Reasons must be "related to the particular case to be tried." *Batson*, 476 U.S. at 98, 106 S.Ct. 1712.  "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769.

The court need not accept any proffered rationale.  We have recognized that "[w]hen there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." *Johnson*, 3 F.3d at 1331.  The court must evaluate the record and consider each explanation within the context of the trial as a whole because "'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'" *Hernandez*, 500 U.S. at 363, 111 S.Ct. 1859 (quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)); *see also Miller-El*, 125 S.Ct. at 2324 (noting that *Batson* requires inquiry into "'the totality of the relevant facts' about a prosecutor's conduct" (quoting *Batson*, 476 U.S. at 94, 106 S.Ct. 1712)); *Batson*, 476 U.S. at 93, 106 S.Ct. 1712 ("In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." (internal quotation marks omitted)).  A court need not find all nonracial reasons pretextual in order to find discrimination.  "[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination." *Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003); *see also United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)[.]

*Kesser v. Cambra*, 465 F.3d 352, 359-61 (9th Cir. 2006).  In order to best evaluate the plausibility of a prosecutor's stated reasons in light of all the evidence, this third step should include a comparative analysis of T.M. and the jurors who were allowed to remain.  *See Miller-El v. Dretke*, 545 U.S. 231, 241 n.2 (2005); *Kesser*, 465 F.3d at 361 ("in *Miller-El*, the [Supreme] Court made clear that the comparative analysis is required even when it was not requested or attempted in state court").

         With these standards in mind, the prosecutor's proffered race-neutral reasons for the *Batson* challenge are examined, keeping in mind that under the additional constraint of

/////

1 AEDPA, this court can only grant the petition "if it was unreasonable to credit the prosecutor's

2 race-neutral explanations."  S*ee Rice*, 546 U.S. at 338.

3    The prosecutor's stated reasons for exercising a peremptory challenge against

4 T.M. included (1) concern that T.M. neither rented nor owned her home which possibly reflected

5 an inability to accept "grown-up responsibilities"; (2) T.M.'s failure to respond to the question

6 whether she believed a defendant charged with a crime might not tell the truth; (3) her previous

7 litigation against a former employer and the fact that she pursued the case to a trial; and (4) her

8 brother's drug possession conviction.

9      1.  Neither Renting nor Owning Home

10    Asked whether she rented or owned her home, T.M. marked "N/A" on the

11 questionnaire.  Supplemental Clerks' Transcript ("SCT") at 421.  The prosecutor stated, as to this

12 reason:

13    On the first page on do you rent or own a residence, she put "not
applicable".  So, to me, that would be an indication that she
14    probably still lives with her parents and she is 31 [*sic*] years old.
So I had concerns about taking grown-up responsibilities with that
15    answer.

16 Augmented Reporter's Transcript ("ART") at 286.

17    The prosecutor did not question T.M. about her N/A response, which could

18 indicate a possibility of pretext.  *See, e.g.*, *Ex Parte Travis*, 776 So.2d 874, 881 (Ala. 2000)

19 ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State

20 alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext

21 for discrimination").  On the other hand, this is not a case in which the prosecutor failed to

22 engage in *any* meaningful voir dire of the excused juror.  *C.f. United States v. Esparza-Gonzalez*,

23 422 F.3d 897, 905 (9th Cir. 2005) (the fact that the prosecutor waived any questioning of the

24 jurors provided support for an inference of intentional discrimination); *Fernandez v. Roe*, 286

25 F.3d 1073, 1079 (9th Cir. 2002) (relying partly on the fact that the "prosecutor failed to engage in

26 meaningful questioning of any of the minority jurors" to establish a prima facie case).  And,

1   importantly, while the prosecutor stated he "had concerns" about T.M.'s response in this regard

2   (ART at 286), his primary indicated reason for exercising a challenge against T.M. was

3   something else: "her case in suing an employer and going all the way through trial," a topic about

4   which the prosecutor did question T.M.  (ART at 218-19).

5            Of the twelve accepted jurors, nine indicated that they owned their home and the

6   remaining three indicated that they rented their home.  SCT at 4, 17, 32, 47, 62, 77, 92, 107, 122,

7   137, 152, 167.  Thus, no other juror responded N/A to this question and a comparative juror

8   analysis gives no indicia of pretext.  The prosecutor's instinctive assessment about T.M.'s

9   predisposition based on the fact that she neither rented nor owned her home is an example of a

10   subjective factor that can play a legitimate role in jury selection.  *See Burks v. Borg*, 27 F.3d

11   1424, 1429 (9th Cir. 1994) (explaining that in the absence of strong objective evidence of

12   discrimination, reliance on such factors is proper), *cert. denied*, 115 S.Ct. 1122 (1995).

13   Considering the totality of circumstances in this case, a reasonable argument exists that this

14   proffered reason was not pretextual.

15                        2.      Question Left Blank

16            T.M. left blank a single question on her juror questionnaire, the one which asked

17   "Do you believe that it is possible that a defendant charged with a crime might not tell the truth?"

18   CST at 432.  The prosecutor stated, as to this reason:

19               And then on page 12, after having [the concern about her brother's
                 drug possession conviction], I got to the packet on witness
20               credibility where she didn't answer, if you believe it's possible the
                 defendant charged with a crime might not tell the truth.  And I
21               didn't see any other questions that she had missed.

22   ART at 286.

23            Petitioner's attorney opined in response to the prosecutor's explanation that it

24   appeared T.M. inadvertently left the question blank and further noted T.M. indicated her

25   agreement with the statement on the following page that "it is possible for any witness to swear

26   to tell the truth and yet lie under oath[.]"  CST at 433; ART at 288.  In explanation to this latter

                                                12

1  question, T.M. wrote "There are a number of reasons why I feel this way. I feel that there are

2  some people who do not take the oath in a serious manner." CST at 433.  T.M. also indicated

3  she believed she was a good judge of a person's honesty or credibility, and wrote in explanation

4  "I feel I am well rounded, well traveled and experienced with dealing w/ multiple types of people

5  on various levels.  I believe being open minded helps me adhere to a persons [*sic*] credibility &

6  honesty." CST at 434.  The prosecutor did not question T.M. about her blank response to this

7  particular question, which could have resolved the issue entirely.

8        In comparison, accepted jurors 2-12 all responded "yes" to this question, and

9  wrote in explanations for their affirmative answer.[4]  SCT at 28, 43, 58, 73, 88, 103, 118, 133,

10  148, 163, 178.  Also of note is that juror number 5 left blank a different question which asked "Is

11  there any reason you cannot be fair to all sides in this case?" CST at 76.  Juror number 5

12  explained that the omission was inadvertent when petitioner's attorney asked about the omission.

13  ART at 302.

14        It is somewhat unconvincing that T.M.'s blank response to this particular question

15  was truly concerning to the prosecutor regarding her ability to serve as a fairminded juror.  As set

16  forth, T.M. agreed that any witness could swear to tell the truth and yet lie under oath; this would

17  of course include a defendant.  Petitioner's attorney argued that her responses to two other

18  questions evidenced a "pro law enforcement" stance.  ART at 288.  In particular, T.M. indicated

19  she agreed with, and would follow a law that "says a perpetrator who kills a victim during the

20  course of a robbery, even if the killing was an accident, is guilty of murder"; and another that

21  says "those who aid and abet the commission or attempted commission of the crime" are equally

22  guilty of a crime as other principles.  CST at 434.  While these responses are not necessarily "pro

23  law enforcement," neither are they "pro-defense."  Most importantly, it seems most likely that

24  T.M. inadvertently failed to respond to the question at issue, which was the last question on the

25  _____

26      [4] Because two pages of juror number one's questionnaire are inexplicably missing from the record, it is not apparent how juror number one responded to this question.  CST at 13-14.

1    page.  On this record, the prosecutor's second stated reason for excusing T.M. gives some

2    evidence suggesting pretext.

3                              3.      Previous Litigation

4                The prosecutor asked a prospective panel of jurors including T.M.: "Has...

5    anybody here... had to testify in court or in a deposition or anything like that?"  ART at 218.

6    T.M. responded yes, and the following exchange occurred:

7                      [PROS.:]        Okay.  How many times have you had to testify?

8                      [T.M.:]Once.

9                      [PROS.:]        And what were the circumstances of that?

10                     [T.M.:]It was for my case.  I had a run-in with one of my
                              employers and so I was suing the company.  And so at the
11                            deposition and at the trial I testified.

12                     [PROS.:]        So did it actually go through trial?

13                     [T.M.:]I'm sorry?

14                     [PROS.:]        Did it go through trial or did you just have to testify
                              at a deposition?
15
                       [T.M.:]No, it went to trial.
16
                       [PROS.:]        And how did you feel about having to testify?
17
                       [T.M.:]Well, I mean, I felt pretty good about it because it was my
18                            case.  And I, you know, I was confident on everything that I
                              said because it happened to me so...
19
                       [PROS.:]        And you weren't nervous at all?
20
                       [T.M.:]Oh, absolutely.
21
                       [PROS.:]        Okay.
22
                       [T.M.:]Absolutely.
23
                       [PROS.:]        That's what I'm trying to kind of find out.
24
                       [T.M.:]Sure.
25
                       [PROS.:]        What do you think caused you to be nervous?
26

                                            14

1        [T.M.:]Just re-living everything that I had went through and having
2                  to present all my personal information to people I had no
                  idea about.

3        [PROS.:]      Yeah, who you were?

4        [T.M.:]Right.

5
        [PROS.:]      Thank you.
6

7  ART at 218-219.

8        The prosecutor explained, as to this proffered reason:

9        [L]astly, when we were asking her questions, she said that she sued
        her employer and taken [*sic*] her case to trial.  My feelings, this
10      would cause her to have a natural empathy with people who want
        to take their case all the way through trial.
11
        And probably more than anything, based on – based on that
12      concern about her taking her own case in suing an employer and
        going all the way through trial, I just didn't feel that she would be
13      the best juror for my case.

14  ART at 286-87.

15        The prosecutor similarly questioned other panels of prospective jurors about their

16  experiences testifying in court or depositions, indicating this was an issue of importance to him.

17  ART 218-26, 336-37, 793.  In comparison, none of the accepted jurors reported that they had

18  previously testified as plaintiffs in civil cases or brought a case to trial as a plaintiff.

19        The trial court specifically credited this proffered reason and the state court held

20  that T.M.'s perceived "empathy with people who want to take their cases all the way through

21  trial" was a valid and nondiscriminatory reason for the prosecutor to exercise a peremptory

22  challenge.  Ex. A at 24.  As set forth, "[p]eremptory challenges are a legitimate means for

23  counsel to act on... hunches and suspicions."  *See Burks*, 27 F.3d at 1429 n.3; *see also J.E.B. v.*

24  *Alabama ex. rel. T.B.*, 114 S.Ct. 1419, 1431 (1994) (O'Connor, J., concurring) ("[A] trial

25  lawyer's judgments about a juror's sympathies are sometimes based on experienced hunches and

26  educated guesses... That a trial lawyer's instinctive assessment of a juror's predisposition cannot

1   meet the high standards of a challenge for cause does not mean that the lawyer's instinct is

2   erroneous."). Under AEDPA, this state court determination is entitled to deference. That is, it

3   cannot be said that there is no possibility that "fairminded jurists could disagree" on its

4   correctness based on the record. *See Richter*, 131 S.Ct. at 786. Accordingly, this proffered

5   reason gives no evidence of pretext.

               4.      Brother's Drug Possession Conviction

7              T.M. wrote on her questionnaire that her brother had been arrested for drug

8   possession. She was unsure of the approximate year of the arrest or the circumstances, but wrote

9   that the final outcome was "probation." CST at 426. The prosecutor stated, as to this proffered

10  reason:

> [S]he said that she had a brother that had a conviction for drug
> possession. And this matter involves drugs and people who might
> have possessed drugs. So I was concerned about her ability to be
> fair based on her family history.

14  ART at 286.

15             In comparison, some of the jurors who were selected to serve had family members

16  with previous arrests or had been arrested themselves, though none of the reported arrests were

17  for drug possession. In this regard, jurors three, six, eight, ten, and eleven reported no previous

18  arrests of themselves or any relatives. CST at 37, 82, 112, 142, 157. Juror number one reported

19  a cousin who was arrested for sodomy/rape (CST at 9); juror number two reported two sons who

20  had been arrested for domestic violence (CST at 22); juror number four reported a daughter with

21  an unknown arrest (CST at 52); juror number five reported a husband with a DUI arrest and a

22  cousin who had been arrested and convicted of murder (CST at 67); juror number seven had been

23  arrested for DUI (CST at 97); juror number nine reported a husband with a DUI arrest (CST at

24  127); and finally, juror number twelve reported son with a DUI arrest and a brother who was

25  arrested for theft (CST at 172).

26  /////

1      A proper reason supporting a peremptory challenge must be "related to the

2  particular case to be tried." *Batson*, 476 U.S. at 98.  The prosecutor's proffered reason of a drug

3  related arrest in T.M.'s family history is sufficiently related since the case to be tried involved

4  drugs.  On the other hand, the case was actually a murder case and juror number five reported a

5  cousin who had been convicted of murder.  While the circumstances presented by T.M. and juror

6  number five are not identical, it must be remembered that "[a] *per se* rule that a defendant cannot

7  win a *Batson* claim unless there is an exactly identical white juror would leave *Batson*

8  inoperable."  *See Miller-El*, 545 U.S. at 247 n.6.  Unfortunately, the alleged similarity between

9  T.M. and juror number five was not raised at trial such that the prosecutor had a chance to

10  explain why he exercised a peremptory challenge to T.M. but not as to juror five.  The Supreme

11  Court has recognized that a retrospective comparison of jurors based on a cold appellate record

12  can be misleading when the alleged similarities were not raised at trial.  *Snyder v. Louisiana*, 552

13  U.S. 472, 483 (2008).  In such a situation, "an appellate court must be mindful that an

14  exploration of the alleged similarities at the time of trial might have shown that the jurors in

15  question were not really comparable." *Id*.

16      "[W]hen illegitimate grounds like race are in issue, a prosecutor has simply got to

17  state his reasons as best he can and stand or fall on the plausibility of the reasons he gives."

18  *Miller-El*, 545 U.S. at 252.  This proffered reason presents a close call.  This court, however, is

19  bound by the constraint of AEDPA.  The trial court accepted the prosecutor's explanation and

20  found that this proffered reason was race neutral (ART at 289-90), and the state appellate court

21  agreed it was a valid, nondiscriminatory reasons for exercising a peremptory challenge against

22  T.M..  Ex. A at 24.  On the record and circumstances present, this state court determination of

23  fact is reasonable and is entitled to deference.  *See Richter*, 131 S.Ct. at 786.  Accordingly, this

24  fourth and final proffered reason provides no evidence of pretext.

25  /////

26  /////

5.      Summary and Conclusion

In sum, just one of the four proffered non-racial reasons of the prosecutor for striking T.M. gives some indicia of pretext.  Petitioner fails to carry his ultimate burden of demonstrating the state court's rejection of the claim is based on an unreasonable determination of the facts in light of the evidence presented.  That "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility" does not suffice to supercede the trial court's credibility determination on habeas corpus review.  *Rice*, 546 U.S. at 341-42.  The evidence here is simply not "too powerful to conclude anything but" the contrary of the state court's determination.  *See Miller-El*, 545 U.S. at 265.  No relief is available.

B.      Evidentiary Exclusion of Impeachment Evidence

At trial, petitioner's attorney began to cross-examine Magana about an unrelated and uncharged incident in 2001 in which someone fired a gun out of Magana's car.  Reporter's Transcript ("RT") at 1360.  The trial court interrupted and asked counsel to approach the bench. RT at 1361.  Following an unreported bench conference, the trial court granted Magana's motion to strike the testimony and the court admonished the jury to disregard evidence relating to the 2001 incident.  RT at 1361.

In an offer of proof in his motion for new trial, petitioner alleged that witnesses had identified Magana, the driver, as the person who fired the shots in the 2001 incident, although Magana had claimed that a passenger was the shooter.  Clerk's Transcript ("CT") at 1076.  The trial court ruled the impeachment evidence was inadmissible:

> "[I]f you are going to ask about misdemeanor conduct where there was no conviction, then you are opening up a trial within a trial. And I think it would involve undue consumption of time to put on this evidence. [¶] You are going to put on evidence that the defendant... committed misdemeanor conduct and then the other side is going to put on evidence to rebut that and we are going to be spending time trying the issues in this three-year-old misdemeanor case that never went to court. [¶] And I think that would involve an undue consumption of time.  And also I think the relevance would be minimal if not nil in view of the fact that there was never a conviction. [¶] So, because of that, I think that it's a

18

1            strong [Evidence Code section] 352 issue that it takes more time
           than- would involve more time than the probative value would be
2            worth.  That, therefore, it should be excluded and that's why I
           didn't allow it."
3

4 Ex. A at 29.  Petitioner contends the trial court erred in ruling the defense could not introduce

5 evidence of specific acts of Magana's dishonesty to impeach his credibility.

6            First, to the extent petitioner challenges the trial court's ruling as incorrect under

7 state law, no relief is available.  *See* 28 U.S.C. § 2254(a) ("Federal habeas corpus relief is

8 available to a state prisoner only to correct violations of the United State Constitution, federal

9 laws, or treaties of the United States"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court

10 may not issue a writ on the basis of a perceived error of state law.").  A state court's erroneous

11 evidentiary ruling is grounds for federal habeas corpus relief only if it rendered the state

12 proceedings so fundamentally unfair as to violate due process. *See generally Williams v. Taylor,*

13 529 U.S. 362, 375 (2000); *see also Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000); *see also*

14 *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005) ("[A] petitioner bears a heavy burden in

15 showing a due process violation based on an evidentiary decision.").

16            Whether rooted directly in the Due Process Clause of the Fourteenth Amendment,

17 or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the

18 Constitution guarantees criminal defendants a meaningful opportunity to present a complete

19 defense. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation marks

20 omitted)).  "While the Constitution... prohibits the exclusion of defense evidence under rules that

21 serve no legitimate purpose or that are disproportionate to the ends that they are asserted to

22 promote, well-established rules of evidence permit trial judges to exclude evidence if its

23 probative value is outweighed by certain other factors such as unfair prejudice, confusion of the

24 issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006).  A

25 state law justification for exclusion of evidence does not abridge a criminal defendant's right to

26 present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty

1   interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Crane v. Kentucky*,

2   476 U.S. 683, 689-91 (1986) (discussing the tension between the discretion of state courts to

3   exclude evidence at trial and the federal constitutional right to "present a complete defense").

4          Here, petitioner's impeachment evidence was excluded under section 352 of the

5   California Evidence Code, a well-established rule of evidence that permits a court to exercise its

6   discretion in admitting testimony.  *See* Cal. Evid. Code § 352. The rule does not, in and of itself,

7   abridge a defendant's right to present a defense.  *See Montana v. Egelhoff*, 518 U.S. 37, 42

8   (1996) (addressing Section 352's federal counterpart, Rule 403 of Federal Rules of Evidence).

9          The Supreme Court has not squarely decided the issue whether a state's

10  evidentiary rule requiring a trial court to balance factors and exercise its discretion might violate

11  a defendant's due process right to present a defense.  *See Moses v. Payne*, 555 F.3d at 758

12  (2009).  Rather, "the Supreme Court's cases have focused only on whether an evidentiary rule, by

13  its own terms, violated a defendant's right to present evidence[,] not whether a court's exercise

14  of discretion in excluding evidence violates that right."  *Id*.  Thus, it appears there is no clearly

15  established Supreme Court law supporting petitioner's claim.  *See Id*.; *Knowles v. Mirzarance*,

16  556 U.S. 111, 122 (2009) ("it is not an unreasonable application of clearly established Federal

17  law for a state court to decline to apply a specific legal rule that has not been squarely established

18  by this Court") (internal quotations and citations omitted); *Wright v. Van Patten*, 552 U.S. 120,

19  126 (2008) ("Because our cases give no clear answer to the question presented, ...it cannot be

20  said that the state court unreasonably applied clearly established Federal law") (citation, internal

21  brackets and quotations omitted)).  Since the right petitioner asserts- to admit evidence of

22  uncharged acts to impeach a witness's credibility- has not been established, no relief is available.

23  *See Alberni v. McDaniel*, 458 F.3d 860, 867 (9th Cir. 2006).

24          In any event, section 352's application here was neither arbitrary nor

25  disproportionate to the purposes it is intended to serve and it did not violate petitioner's due

26  process right to a fair trial or his right to present a defense.  In deciding if the exclusion of

evidence violates the due process right to a fair trial or the right to present a defense, the Ninth

Circuit balances the following five factors: (1) the probative value of the excluded evidence on

the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4)

whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a

major part of the attempted defense.  *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004).

The proffered evidence, though relevant to Magana's credibility and petitioner's

defense, had limited probative value.  It uniformly involved alleged conduct of which Magana

had not been convicted and depended upon the proffered testimony of other witnesses.  The trial

court acted within the bounds of the Constitution in determining that the limited probative value

of the excluded evidence was outweighed by the undue consumption of time the presentation of

such evidence and attendant jury instructions would require and the danger of confusion of the

issues to the jury.  *See Scheffer*, 523 U.S. at 315 (noting that "collateral litigation prolongs

criminal trials and threatens to distract the jury from its central function of determining guilt or

innocence").  In light of the multiple additional witnesses and jury instructions that allowing the

proffered evidence would have entailed, the trial court had legitimate concerns that proving up

Magana's prior, uncharged conduct would have resulted in a "trial within a trial" on a collateral

matter, thus unduly complicating the matter.  No relief is available for petitioner's exclusion of

evidence claim.

C.      Suppression of Evidence

Soon after jury deliberations began, the prosecution disclosed the existence of a

letter written by Magana from jail which had been intercepted sometime earlier by the sheriff's

department.  Ex. A at 33.  Petitioner asserted the failure to disclose this evidence was error

requiring reversal under *Brady v. Maryland*, 373 U.S. 83 (1963), but the trial court disagreed and

denied the motion to reopen proceedings.  *Id.*

The suppression before trial of requested evidence favorable to an accused

violates due process where the evidence is material either to guilt or to punishment, irrespective

1   of the good faith or bad faith of the prosecution.  *Brady*, 373 U.S. at 83; *see also United States v.*

2   *Bagley*, 473 U.S. 667, 676 (1985) (holding that the *Brady* duty to disclose applies to exculpatory

3   evidence as well as evidence that could be used to impeach witnesses).  In the *Brady* context,

4   "evidence is material only if there is a reasonable probability that, had the evidence been

5   disclosed to the defense, the result of the proceeding would have been different."  *United States*

6   *v. Bagley*, 473 U.S. 667, 682 (1985).  The relevant question is whether, without the information,

7   the petitioner received a fair trial resulting in a verdict worthy of confidence.  *Kyles v. Whitley*,

8   514 U.S. 419, 434 (1995).  The proper focus is whether the net effect of the undisclosed evidence

9   undermined the outcome of the trial.  *Id*. at 421, 436-37.

10          The state appellate court rejected petitioner's claim of *Brady* error, holding:

11          Defendant's *Brady* claim centers on a letter that sheriff's deputies
            intercepted at the jail.  In this letter, Magana wrote to a friend that
12          he thought he "might get washed (Life in the pen)," but added "the
            weird part of that thought is I don't care."  Later in the letter, he
13          wrote: "oh do me a favor stay away from ALL black people!!!
            There [*sic*] all the same.  Big mouth, liar, rats.  So be careful!  Stay
14          with whites!  Your own people!  Even your own race will do you
            dirty don't get me wrong Just be careful who you trust!"
15
            Defendant contended that this evidence was favorable to him
16          because it would have impeached Magana.  Specifically, he
            asserted the first quoted sentence constituted an admission or
17          confession, and the second demonstrated Magana's antipathy
            toward African-Americans and bias against defendant, who is
18          black.

19          The trial court found the comments about a possible prison
            sentence to be ambiguous and noted that Magana's relationship
20          with defendant had been explored at trial.  The court therefore
            concluded there was no reasonable likelihood that the letter would
21          have changed the jury's decision.

22          Defendant asserts these conclusions were erroneous.  We disagree.

23          Even if we assume that two of the three prongs of the *Brady* test
            were met, that is that the letter was potentially impeaching
24          evidence and that it had been suppressed by the State (see *In re*
            *Brown* (1998) 17 Cal.4th 873, 879-880), defendant's claim
25          founders on the third *Brady* prong: the letter was not material and
            therefore not prejudicial.

26

                                              22

As the trial court noted, a fear of being found guilty does not constitute an admission or confession; it simply indicated Magana's belief that "he could get convicted[,] guilty or innocent. An a lot of people feel like that." The bravado exhibited in Magana's statement that he did not care if he was convicted does not transform his remark into a confession or admission.

Moreover, as the court also noted, other evidence, relating to the same issue, was in fact admitted at trial: Magana had told a deputy that he had flushed his ring down the jail toilet because "where he was going, he did not need it." Magana was also cross-examined about another letter in which he had also expressed his belief that he was going to go to prison; he explained that he had "no faith in the system" and thought he was going to serve time despite his innocence. The trial court properly concluded that, given these circumstances, the letter at issue would have had little, if any, effect on the jury.

The court also properly concluded that Magana's warning to his friend to "stay away from ALL black people" would have been unlikely to have affected the jury's verdict. Magana had testified that defendant was the only black person he knew, and his relationship with defendant was explored at length and described by many witnesses.

In sum, defendant has failed to establish the materiality of this evidence under *Brady*. There was no error.

Ex. A at 35-37.

A copy of Magana's letter appears in this record attached to petitioner's motion for new trial. CT at 1105-08. For the reasons set forth by the state court, there is no probability that the result of the proceeding would have been any different had this letter been available at trial. The state court's rejection of this claim based on a determination that the letter was not material is consistent with, and a reasonable application of the *Brady* materiality standard. *See, e.g.*, *United States v. Sarno*, 73 F.3d 1470, 1506-07 (9th Cir. 1995) (undisclosed evidence is not material under *Brady* where it "tugs at loose threads hanging from the margins of the Government's case, but in no way challenges the bulk of the evidence on which the convictions rest"). No relief is available.

/////

/////

D.      Ineffective Assistance

At the preliminary hearing, there was testimony that "[Magana] admitted to the informant [Scott Fausett] that he had shot Kevin once in the head and three times in the body. And that [petitioner] was also involved in the shooting."  CT at 88.  At trial, Magana testified to the contrary that he was an innocent bystander while petitioner committed the murders.  He was cross-examined about his earlier statement to Fausett which he denied as a lie and a fabrication by Fausett.  CT at 1075-76.  Petitioner claims defense counsel rendered ineffective assistance by not recalling Fausett to testify about co-defendant Magana's previous confession.

Habeas corpus petitions asserting ineffective assistance of counsel are governed by the clearly established federal law of *Strickland v. Washington,* 466 U.S. 668, 686, (1984). *See Baylor v. Estelle,* 94 F.3d 1321, 1323 (9th Cir. 1996).  Ineffective assistance of counsel exists where "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland,* 466 U.S. at 686.  In order to make a state a cognizable claim under *Strickland,* petitioner must show, first, that counsel performed deficiently, and second, that prejudice resulted from counsel's deficient performance.  *Id.* at 688.

"Surmounting *Strickland's* high bar is never an easy task."  *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (citing *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010)). Establishing an unreasonable application of *Strickland* by a state court is all the more difficult: "the question is not whether counsel's actions were reasonable[;] [t]he question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.  *Richter*, 131 S. Ct. at 788 (internal quotations and citations omitted).

The California Court of Appeal rejected petitioner's ineffective assistance claim on direct appeal:

> Raising a claim of ineffective assistance of counsel, defendant
> contends his attorney should have recalled Scott F. To testify about
> a statement that codefendant Magana allegedly made to him.  In

this statement, described at the preliminary hearing, Magana said he shot Kevin Dehnke but only grazed him.  Kevin then attacked him, and Magana called for help.  Defendant responded by shooting Kevin in the head.  On appeal, defendant asserts this evidence contradicted Magana's trial testimony that he was an innocent bystander and therefore would have impeached his credibility.  It also would have provided a factual basis for an instruction on imperfect self-defense.  Contrary to defendant's contention, the failure to recall Scott to testify does not constitute ineffective assistance of counsel.

[....]

At the hearing for new trial, defense counsel noted that while he was able to cross-examine Magana about his statements to Scott, the jury never "heard about it from [Scott's] lips."  Counsel argued that the "cross-examination lacked the salience that it would have had had [Scott] been able to tel the jury what was told to him in the first place."  He added, "I guess a tactical decision was made not to put [Scott] back on and I think cross-examining Magana, that was... not particularly effective."  The court noted that Scott could have been ordered back to testify had defendant made such a request.

Trial tactics are ordinarily left to the discretion of trial counsel. We evaluate these decisions from counsel's perspective at the time they were made, and presume that they fall within the wide range of reasonable professional assistance. A conviction will be reversed only if the record affirmatively discloses that counsel had no rational tactical purpose for his act or omission; in all other cases, any relief must come through habeas corpus proceedings.

Here, counsel suggested he had tactical reasons for not recalling Scott to testify.  Those reasons are not difficult to imagine. Defendant painted Scott as an unreliable and incredible witness, and he even suggested that Scott might have been involved in the murders.  Calling Scott to testify on his behalf might have undermined that claim.  Under these circumstances, the decision not to recall Scott was a matter of trial tactics, not evidence of ineffective assistance of counsel.

Ex. A at 38-39 (internal quotations and citations omitted).

Although trial counsel indicated to the trial court "a tactical decision was made not to put [Fausett] back on [the stand]" (RT at 1771), the record is silent as to counsel's reasoning underlying the decision.  Nevertheless, applying the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, as this court must (*see*

1   *Bell v. Cone*, 535 U.S. 685, 698 (2002)), a reasonable argument exists that the decision not to

2   recall Fausett resulted from competent professional judgment.  Among counsel's possible

3   reasons is, as the state court held, the fact that calling Fausett as a defense witness might have

4   impaired the defense theory that Fausett lacked credibility and that he lied in his testimony

5   inculpating petitioner to hide own culpability related to the murders.  RT at 1591-97, 1612-15.

6   The California Court of Appeal's rejection of petitioner's ineffective assistance claim on this

7   basis was consistent with, and a reasonable application of the *Strickland* standard.

8                    E.      Denial of *Marsden* Motion

9                    As set forth, in petitioner's first appeal, the California Court of Appeal held that

10  the trial court erred in failing to conduct the inquiry required under *People v. Marsden*, 2 Cal.3d

11  118 (1970) and remanded the case to the trial court with directions to conduct a hearing allowing

12  petitioner to explain the reasons why he requested the appointment of new counsel.  For his final

13  ground, petitioner claims the trial court's denial of his *Marsden* motion, which caused the

14  judgment against him to be reinstated, was an abuse of discretion and a violation of his Sixth

15  Amendment rights.

16                   The California Court of Appeal set forth a detailed summary of the evidence at the

17  hearing and affirmed the denial of the *Marsden* motion:

18          Defendant contends that the trial court abused its discretion in
            denying his *Marsden* motion.  We disagree.
19
            "*Marsden* motions are subject to the following well-established
20          rules.  ""When a defendant seeks to discharge his appointed
            counsel and substitute another attorney, and asserts inadequate
21          representation, the trial court must permit the defendant to explain
            the basis of his contention and to relate specific instances of the
22          attorney's inadequate performance. [Citation.] A defendant is
            entitled to relief if the record clearly shows that the first appointed
23          attorney is not providing adequate representation [citation] or that
            defendant and counsel have become embroiled in such an
24          irreconcilable conflict that ineffective representation is likely to
            result [citations].' [Citations.]"' [Citation.] Denials of *Marsden*
25          motions are reviewed under an abuse of discretion unless the
            defendant has shown that a failure to replace the appointed attorney
26          would "substantially impair" the defendant's right to assistance of

                                        26

counsel. [Citations.]'" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)

In his *Marsden* hearing, defendant asserted that his attorney, Mr. Shaver, did not thoroughly investigate his case.  On appeal, defendant focuses on two of these alleged shortcomings, specifically, that his attorney failed to investigate statements by inmates Michael Simons and Latroy Taylor.

In one of these claims, defendant asserted that he "was out in the county jail with an inmate by the name of Michael Simons.  Michael Simons stated that Mr. Magana [co-defendant] sent a private investigator to interview him. [¶] The reason being was to have Mr. Simons testify falsely against me.  Mr. Simons brought this to my attention.  And was willing to testify to what was asked of him by this investigator.  This is a pattern by Mr. Magana.  It should have been brought up during trial."

In response, Attorney Shaver explained: "What I recall is Mr. Simons had told [defendant] that someone working with Joel Magana or his attorney had come to talk to him about what [defendant] felt was false testimony, and that was that Michael Simons told [defendant] that he had been offered money if he would testify that... [defendant] had confessed to him to the shooting."

He continued, "Now the problem with that is that this is someone other than Magana. [¶] Magana had not confessed to Michael Simon about doing the shooting himself.  So it's not – it's hard to get – to track that back to Joel Magana.  It's not a typical confession. [¶] Now I felt at the time that I had a much better issue regarding Joel's manipulation of the facts, presenting false testimony and so forth. [¶] I had police officers under [s]ubpoena about an incident in Galt where Joel Magana allegedly had shot at someone out of a car while he drove, and then when confronted by the police officers about that, had tried to blame it on the passenger in the car, which was almost an identical situation that I thought [defendant] faced, that... [defendant] was the passenger in the car. [¶] [Defendant] had no part in planning or setting up this shooting, this preempted strike against the deceased, but Magana was blaming [defendant] for it, so I felt that that... was a real good credible situation showing that Magana was not to be trusted. [¶] He had done the same kind of thing before and tried to blame something else."

Attorney Shaver continued, "So I tried to cross-examine him about that, but I was prevented because of Evidence Code [section 352. ... [¶] So frankly, I didn't feel that I'd be allowed to bring in Michael Simon either, and I didn't feel that it was as reliable as this other matter where I had actual police officers that would testify as to what Joel Magana had told them and how he talked himself out

of that conviction."

Counsel explained the extensive investigation he had personally undertaken, as well as the work done by his investigator.  In response to further questioning by the court, Attorney Shaver said neither he nor his investigator spoke to Michael Simons because he "felt it was too remote... there was an investigator, I don't know who that was who had talked to him.  It wasn't Joel Magana apparently, and there was no confession from – it wasn't as though Magana went to Michael Simons and said, hey I shot these people, but I want you [to] testify that [defendant] did."  Counsel thought this story was "flaky" and believed he had "something even better with the incident in Galt."

He added, "[I]n retrospect I wish I had followed up, but I thought it was too remote.  There was no confession there, there's potentially a statement against penal interest, but on seeing this guy on the stand, now this is – I don't know if this was in my mind then because I don't remember what was going through my mind, but Mr. Magana could easily have gotten on the stand and said, no, I just wanted him to tell the truth.  And, in fact, he came to me telling me the same thing about [defendant]."  In other words, he explained, "Mr. Magana could have got[ten] on the stand after the guy testified and said – no, this guy contacted me and wanted me – told me that [defendant] was going to hire him to say that I confessed to him, that I confessed."  Counsel noted that he did not think Simons was "all that credible" but he wished he "had followed through more on it."  He reiterated his belief that he had a "much better and less flaky incident, where I had police officers who... would talk about what Magana himself, not a third person, not an investigator, had told him and had done in a manner that I thought was strikingly similar."

Defendant's second claim to support his *Marsden* motion involved another inmate, Latroy Taylor.  Magana had testified at trial that he heard that Taylor was in a cell near defendant and that Taylor heard defendant bragging and laughing at Magana.  Magana admitted that he had written a letter to Taylor negotiating to pay him $1,300 to testify.

Defendant asserted that his attorney should have subpoenaed "the log sheets on Latroy Taylor['s] cell movements because [the] record would have showed it was physically impossible for me to have talked to Latroy Taylor about my case. [¶] The fact is that Taylor and Magana's scheme was fabricated and should have been brought into the evidence for the eyes of the jury.  It shows a pattern by Mr. Magana, which established character which is crucial toward one['s] credibility."

Attorney Shaver responded, "I don't recall anything about Latroy Taylor.  What I do recall is a jailhouse snitch, a possible jailhouse

snitch. I think that was Michael Simons. I don't remember anything about Latroy Taylor...." He added, "I know I've represented someone by the name of Latroya Taylor, but I don't recall – and the name is familiar to me. I just don't recall that at all. But it's been four years. I'm not saying it didn't come to my attention. I just don't recall it at all."

In denying defendant's *Marsden* motion, the trial court reviewed defendant's claims about Simons and Taylor and Attorney Shaver's responses, and noted that the critical question was whether defendant's right to counsel was substantially impaired. The court concluded that defendant had not met his burden of establishing some impairment, stating: "I don't think that Mr. Shaver failed to do what he needed to do here, and he testified, he stated he had worked on this for about 18 months, and he put a lot of time in on the case. [¶] He said he did have an investigator, but most of the investigation he did himself, for instance, he didn't want the witness talking to the defendant because he was afraid that notes might fall into the hands of a third party.

"I think that Mr. Shaver did investigate this case. I think that he did all that he should have done, and that small area, that he did not do, I don't think that that is enough to say that there was substantial impairment.

"So I am going to make a finding that had I conducted this, the rest of this inquiry that we went through today at the time of the original *Marsden* motion, I would not have granted it, and I think under the [s]tate of the law, the law that we have on *Marsden*, would not have required that Mr. Shaver be relieved."

"So once again, I'm going to deny the *Marsden* motion."

The trial court's ruling was well within its discretion. Counsel explained that he had decided to challenge Magana's credibility and pattern of blaming others for offenses he had committed by calling police officers to testify about another incident. The fact that the court ultimately excluded this testimony under Evidence Code section 352 does not reflect a lack of investigation on counsel's part. Counsel did not think Simons's story was credible and he described how he thought Magana might have responded to that testimony. Although Attorney Shaver did not remember hearing about inmate Latroy Taylor, the explanation he offered was generally applicable: he believed that police officer testimony would provide more effective impeachment evidence than testimony from an inmate.

Moreover, defendant himself was less than clear about how the log records for Taylor's cell housing would have shed light on Magana's credibility or otherwise established that Taylor could not have somewhere heard defendant bragging about the crimes.

> Counsel in fact sought to impeach Magana at trial by questioning him about his communications with Taylor.
>
> While it is true that counsel did not contact Taylor or Simons, counsel is not required to investigate all possible witnesses. (*People v. Barnett, supra,* 17 Cal.4th at p. 1111.)  The trial court acted well within its discretion in concluding that counsel had conducted an appropriate investigation, and that defendant had not established that his right to counsel was substantially impaired. The court did not err in denying defendant's *Marsden* motion and reinstating the judgment against him.

Ex. B at 3-9 (alterations and omitted citations in original).

The denial of a *Marsden* motion to substitute counsel can implicate a criminal defendant's Sixth Amendment right to counsel and is properly considered in federal habeas corpus. *Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir. 1994), cert. denied, 513 U.S. 947 (1994), overruled on other grounds by *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc).  The relevant inquiry is whether the petitioner's Sixth Amendment right to counsel was violated.  *See Schell*, 218 F.3d at 1026.  The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between an accused and his counsel.  *See Morris v. Slappy*, 461 U.S. 1, 14 (1983).

The Supreme Court has not specifically addressed the level of inquiry required when a motion to substitute counsel such as California's *Marsden* motion is made by a criminal defendant.  When assessing a trial court's ruling on a *Marsden* motion in the context of a federal habeas corpus proceeding, the Ninth Circuit has held that the Sixth Amendment requires only "an appropriate inquiry into the grounds of such a motion, and that the matter be resolved on the merits before the case goes forward."  *Schell*, 218 F.3d at 1025.  Consideration of a number of factors is appropriate, including the timeliness of the motion, the adequacy of the court's inquiry into the defendant's complaint, and whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense."  *Hudson v. Rushen*, 686 F.2d 826, 829 (9th Cir. 1982).

1    Here, the trial court gave petitioner the opportunity to explain his reasons for

2  wanting substitute counsel.  The court then asked counsel to address the alleged deficiencies, and

3  satisfied itself that counsel's preparation for and representation at trial was adequate.  The record

4  established that there was no breakdown of attorney-client communications; rather, petitioner

5  and his attorney disagreed about trial tactics and whether investigation into a particular matter

6  was warranted.  The factual record developed was sufficient to allow the court to make an

7  informed decision that petitioner's claim of conflict did not require substitute counsel.  *See*

8  *Stenson v. Lambert*, 504 F.3d 873, 887 (9th Cir. 2007) (inquiry was adequate when court

9  determined lines of communication were open and counsel was competent); *United States v.*

10  *Prime*, 431 F.3d 1147, 1155 (9th Cir. 2005) (inquiry was adequate where defendant 'was given

11  the opportunity to express whatever concerns he had, and the court inquired as to [defense

12  attorney's] commitment to the case and his perspective on the degree of communication.");  *Cf.*

13  *Schell*, 218 F.3d at 1027 (remanding for evidentiary hearing where state court failed to make any

14  inquiry into alleged deterioration of attorney-client relationship and substance of claims).  The

15  fact that this inquiry was conducted post-trial, upon remand, is of no import, as the trial court was

16  instructed to vacate the judgment, appoint new counsel, and set the case for retrial if good cause

17  were shown.  The trial court, having inquired into counsel's representation and satisfied itself

18  that representation was adequate, did not violate petitioner's Sixth Amendment rights in denying

19  his *Marsden* motion to substitute counsel.

20                                          CONCLUSION

21    For the foregoing reasons, petitioner's application for writ of habeas corpus

22  should be denied.  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United

23  States District Courts, "[t]he district court must issue or deny a certificate of appealability when

24  it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254.  A certificate of

25  appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial

26  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either

1   issue a certificate of appealability or must state the reasons why such a certificate should not

2   issue.  Fed. R. App. P. 22(b).  For the reasons set forth herein, petitioner has not made a

3   substantial showing of the denial of a constitutional right.

4           Accordingly, IT IS HEREBY RECOMMENDED that

5           1.  Petitioner's application for a writ of habeas corpus be denied; and

6           2.  The district court decline to issue a certificate of appealability.

7           These findings and recommendations are submitted to the United States District

8   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

9   days after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

12  objections shall be filed and served within fourteen days after service of the objections.  The

13  parties are advised that failure to file objections within the specified time may waive the right to

14  appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

15  DATED: September 14, 2012.

16

17                                    UNITED STATES MAGISTRATE JUDGE

18

19  LS/jone3154.hc

20

21

22

23

24

25

26