IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTOPHER HOWARD JONES,

    Petitioner,               No. 2:10-cv-3154 KJM JFM (HC)

    vs.

RAUL LOPEZ,

    Respondent.             FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. At issue are his 2004 convictions for robbery, burglary, and murder in the San Joaquin County Superior Court, case number SF087852B. By order filed August 6, 2013, the district court adopted earlier findings and recommendations and denied petitioner's claims based on the exclusion of impeachment evidence at trial, the suppression of evidence, the ineffective assistance of counsel, and denial of petitioner's Marsden motion. Order filed August 6, 2013 (ECF No. 16) at 2. The court referred petitioner's Batson claim back for further consideration in light of Cook v. LaMarque, 593 F.3d 810, 815 (9th Cir. 2010). The relevant facts are repeated herein as set forth in the prior findings and recommendations (ECF No. 15).

////

1

BACKGROUND

The California Court of Appeal, Third Appellate District, summarized the facts underlying the convictions at issue here. Petitioner is the defendant referred to herein:

> The victims, Kevin and Sabrina Dahnke, were found shot to death in their home in Lodi. Two handguns, a .44 caliber and a .38 caliber, were involved in the incident.
>
> Investigators were soon contacted by Scott F., who told them that defendants [Christopher Howard Jones and Joel Magana] might have been involved in the killings. Kevin was a known marijuana dealer. According to Scott, Kevin had threatened to "jack" a friend who also sold marijuana. Several people, including Scott and defendant Magana, had talked about making a preemptive move, and Magana said he could get guns.
>
> The direct targets of the alleged "jack" soon dropped their plans, but Magana told Scott that he had obtained guns. A day or two later, Magana approached Scott to ask if he was interested in following through on the original plan. When Scott declined, Magana said he would "get [defendant] to do it with him." Magana and defendant were good friends who were "always together." They both worked the night shift at Wal-Mart.
>
> Two days before the murder, Scott went to defendant's apartment and found defendant and Magana in a bedroom, looking at a .44 caliber and a .38 caliber handgun.
>
> On the night of the murder, Magana called Scott and asked him to meet Magana outside. The two talked on the walkway between their apartments. Magana said he was "going to go shoot Kevin and Sabrina," and he showed Scott some potatoes that he said he was going to put on the barrel of the gun. Scott told him there was "no chance of just robbing them, that he was going to have to kill him. Magana responded, "[H]e's already dead."
>
> During this conversation, defendant was sitting in the passenger's seat of Magana's car.
>
> Magana told a friend that he and defendant were going to be going to work about one hour late.
>
> Magana and defendant drove to the victims' home. At about 11:00 p.m., neighbors of the victims heard gunshots. They did not see anyone, but saw a car matching Magana's car parked in the victims' driveway.
>
> Defendant and Magana drove to the home of defendant's sister in Pittsburgh, California. Her fiancé had a reputation as a "gang

2

banger" who sold drugs and arms. Magana called his employer from Pittsburgh and told him that he and defendant were going to be late due to car problems. Neither made it to work that night. Defendant and Magana eventually drove home.

The next morning, a neighbor discovered the victims' bodies. Kevin had been shot four or five times. Sabrina had been shot three times, including once at very close range. A piece of potato was found on the couch.

The same morning, Magana went over to Scott's apartment. Magana was limping and had a large bag of marijuana that he said he had gotten from Kevin. Scott noticed a small amount of blood behind Magana's ear.

Later that day, Scott contacted the police.

Officers arrested defendant and Magana. Testing revealed that both men had small amounts of gunshot residue on their hands.

Large quantities of marijuana were found in defendant's apartment and that of Magana. Officers found clothing in a dumpster outside Magana's apartment complex. Bloodstains on a jacket matched Kevin's genetic profile; bloodstains on a pair of tennis shoes matched Sabrina's. This clothing had been worn by Magana. A bloodstain on the passenger's seat of Magana's car also matched Sabrina's genetic profile.

Defendant and Magana were both charged with two counts of murder, robbery, burglary, and conspiracy to commit these crimes. The information also alleged various firearm enhancements and special allegations.

The prosecution theorized that both defendants had been involved in the shootings, each using a different gun.

Defendant did not testify at trial but argued that he had not been involved in these events. Instead, he suggested that Magana had committed the crimes with Scott or the dealer Kevin was allegedly about to "jack."

Magana testified at trial and placed all responsibility for the murders on defendant. He denied shooting either Kevin or Sabrina, and said he had gone with defendant to Kevin's house simply to buy marijuana. He was taken completely by surprise when defendant pulled out a weapon and shot Kevin. He said Kevin lunged toward him and as the two grappled, Sabrina entered the room and threw something at Magana. The two men fell to the floor, and Magana heard several more gunshots.

Magana said he fled the scene and drove away, but came back for

1  defendant, who then held a gun on him and ordered him to drive to Pittsburgh. Magana said he handled the guns when he got them out of the car.

People v. Jones, No. C048432, Respondent's Ex. A ("Ex. A") at 3-6.

A jury convicted petitioner of robbery, burglary, and two counts of murder, and found true various charged firearm enhancements and special circumstances. Ex. A at 1. The trial court sentenced him to state prison for an aggregate sentence of 56 years to life plus two consecutive life sentences without the possibility of parole. Id.

ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ

4

simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Under AEDPA, a state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Ybarra v. McDaniel, 656 F.3d 984, 989 (9th Cir. 2011).

II. Analysis of Petitioner's Batson Claim

After the prosecutor excused T.M., the sole African-American prospective juror, petitioner objected pursuant to *People v. Wheeler*, 22 Cal.3d 258 (1978), that the peremptory challenge was improperly motivated by race. On appeal, the California Court of Appeal, Third District, found the following facts:

> In her juror questionnaire, T.M. stated she was 33 years old and had an A.A. degree. She worked in hotel special services for Marriott Worldwide Reservations, performing a number of different duties. She responded "N/A" to a question asking whether she rented or owned her residence, and "N/A" to a question asking about the employment history of other adults with whom she resided.
>
> T.M. had no opinions about criminal defense attorneys or prosecutors. She had no prior jury experience, and no law enforcement contacts. However, her brother had been convicted of a drug possession charge and had been placed on probation. T.M. was "unsure" of the details of this offense, but believed her brother was treated fairly. She did not think her brother's situation would have affected her judgment in this case.
>
> T.M. agreed with the legal principles set forth in the questionnaire, and indicated she would apply the same standards for assessing witness credibility to peace officers and other witnesses. One question asked, "Do you believe that it is possible that a defendant charged with a crime might not tell the truth?" but T.M. left this

question blank. However, in response to another question, she indicated that she believed that it was possible for any witness to tell the truth and yet lie under oath. She explained: "There are a number of reasons why I feel this way. I feel that there are some people who do not take the oath in a serious manner." She thought she was a good judge of credibility, noting that she was well rounded, well traveled, open minded, and experienced in dealing with many types of people.

In response to questioning by one defense attorney, T.M. said she "absolutely" could be fair, reiterating that she was well rounded and weighed everything out "as far as making any decisions." She said she would not give more weight to a police officer's testimony, and agreed that officers could make mistakes just like anyone else.

After asking general questions of the entire venire, the prosecutor followed up by asking T.M. about several of her responses. She had received three tickets for speeding and said she deserved them all. T.M. had testified in deposition and trial in a case she had brought against an employer after a "run-in." She said she had been confident about her case, but had been nervous reliving the experience and testifying in front of people she did not know. T.M. affirmed that she could return a guilty verdict if the prosecutor met his burden of proof.

During the second round of peremptory challenges, the prosecutor exercised a peremptory challenge against T.M., and defense counsel objected, citing *Wheeler*.

At the ensuing hearing, the court noted that T.M. was the only black juror in the jury box, and found defendant had established a prima facie case of discrimination. The court asked the prosecutor to explain his challenge.

The prosecutor responded that he did not know T.M.'s ethnicity when he reviewed her questionnaire but some of her responses had given him concern. He noted that T.M. had responded "N/A" when asked whether she rented or owned her residence, which indicated to the prosecutor that T.M. "probably still lives with her parents and she is 31 [*sic*] years old. So I had concerns about taking grown-up responsibilities with that answer."

The prosecutor pointed out that T.M.'s brother had been convicted for drug possession, and this case involved drug use. He said he was concerned "about her ability to be fair based on her family history." He added that "after having that concern, I got to the packet on witness credibility where she didn't answer, if you believe it's possible the defendant charged with a crime might not tell the truth. And I didn't see any other questions that she had missed."

The prosecutor then added, "[L]astly, when we were asking her questions, she said that she had sued her employer and taken her case to trial. My feelings, this would cause her to have a natural empathy with people who want to take their cases all the way through trial. [¶] And probably more of anything, based on- based on that concern about her taking her own case in suing an employer and going all the way through trial, I just didn't feel that she would be the best juror for my case."

Defense counsel responded to these explanations, but the trial court concluded that the prosecutor acted properly in excusing T.M. The court stated, "A peremptory challenge does not have to rise to the level of a challenge for cause. The question in a *Wheeler* motion is whether or not the challenge was made for racial reasons... [I]f a juror has a relative who's been arrested and convicted for other matters, that is a legitimate reason for the prosecutor to excuse the juror. I accept [the prosecutor's] explanation and I think that it is a race neutral reason."

People v. Jones, 2007 WL 2470096 at 10-11.

The state appellate court rejected petitioner's claim of error, holding:

The prosecutor offered valid, nondiscriminatory reasons for exercising a peremptory challenge against T.M., most notably (1) T.M.'s litigation against her employer and perceived "empathy with people who want to take their cases all the way through trial," and (2) her brother's conviction for drug possession. We defer to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.]

Defendant contends that other jurors had relatives with criminal histories, failed to answer all questions on the questionnaire, or had issues with their employer. Even if we assume that a comparative juror analysis is appropriate, defendant does not identify anyone who expressed responses similar to T.M.'s on all of these topics. [Citation.] While some of the seated jurors shared one or another of the characteristics exhibited by T.M., none shared the same constellation of traits. None had both a relative with a drug-related conviction *and* had taken a complaint against his or her employer to trial.

Defendant suggests that the prosecutor should have asked questions of T.M. to clear up any concerns about her living situation. While we agree such questioning might have been helpful, defendant cites no authority to support his belief that the prosecutor was required to engage in such a dialogue before exercising a legitimate peremptory challenge.

In short, defendant's claims under *Batson-Wheeler* are not

7

> persuasive. Substantial evidence supports the trial court's determination that the prosecutor properly exercised his peremptory challenge to excuse T.M.

Ex. A at 24-25.

The Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the basis of race. Batson v. Kentucky, 476 U.S. 79 (1986). People v. Wheeler is "the California counterpart to Batson" (Yee v. Duncan, 463 F.3d 893, 896 (9th Cir. 2006)); however, the standards of Batson control this court's disposition of the case. Lewis v. Lewis, 321 F.3d 824, 827 & n.5 (9th Cir. 2003).[1]

When a defendant asserts that a prosecutor's peremptory challenge is racially-motivated, a trial court applies a three-step process to evaluate the Batson claim. See Hernandez v. New York, 500 U.S. 353, 367 (1991). First, the defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Batson, 476 U.S. at 96-97. Once a prima facie case is established, the burden shifts to the state to articulate a race-neutral explanation for the challenge. Id. at 97. In the third and final step, the trial court must determine whether the defendant carried his ultimate burden of proving purposeful discrimination by evaluating the prosecutor's reasons and making a credibility determination. McClain, 217 F.3d at 1220 (quoting Hernandez, 500 U.S. at 359); *see also* Batson, 476 U.S. at 98.[2]

In Cook v. LaMarque, an en banc panel of the United States Court of Appeals for the Ninth Circuit elaborated on the requirements of the third step: it requires a determination of

---

[1] Petitioner's Wheeler motion preserved his federal constitutional claim because a Wheeler motion serves as an implicit Batson objection. See Boyd v. Newland, 467 F.3d 1139, 1142 n.2 (9th Cir. 2006).

[2] Where, as here, the trial court ruled on the ultimate question of intentional discrimination, the preliminary question of whether the defendant made a prima facie need not be addressed. See Collins v. Rice, 365 F.3d 667, 677 n.6 (9th Cir. 2004) (overruled on other grounds) (citing Hernandez v. New York, 500 U.S. 352, 359 (1991)). In addition, because the prosecutor in this case offered race-neutral reasons in order to meet his burden at the second step of the analysis, this court should proceed directly to an analysis of the third step.

"whether the prosecutor was 'motivated in substantial part by discriminatory intent.'" Cook, 593 F.3d at 815.

> To determine whether race was a substantial motivating factor-that is, whether the defendant has shown "purposeful discrimination" at *Batson*'s third step-the trier of fact must evaluate "the persuasiveness of the justification[s]" offered by the prosecutor. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). "In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93, 106 S.Ct. 1712 (internal quotation marks and citation omitted). This inquiry includes "side-by-side comparisons" of the African American panelists who were struck and white panelists who were allowed to serve. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." *Miller-El v. Dretke*, 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).

Id. Thus, the third step includes a comparative analysis of T.M. and the jurors who were allowed to remain. See id. (citing Miller-El v. Dretke, 545 U.S. 231, 241 n.2 (2005)).

The court examines the prosecutor's proffered reasons for the Batson under these standards. In addition, under the AEDPA standard of review petitioner can only obtain relief on his Batson claim if the state court "was unreasonable to credit the prosecutor's race-neutral explanations." See Rice, 546 U.S. at 338.

As described in the prior findings and recommendations, the prosecutor's stated reasons for exercising a peremptory challenge against T.M. included (1) concern that T.M. neither rented nor owned her home which possibly reflected an inability to accept "grown-up responsibilities"; (2) T.M.'s failure to respond to the question whether she believed a defendant charged with a crime might not tell the truth; (3) her previous litigation against a former employer and the fact that she pursued the case to a trial; and (4) her brother's drug possession conviction.

////

////

1. Neither Renting nor Owning Home

Asked whether she rented or owned her home, T.M. marked "N/A" on the questionnaire. Supplemental Clerks' Transcript ("SCT") at 421. The prosecutor stated, as to this reason:

> On the first page on do you rent or own a residence, she put "not applicable". So, to me, that would be an indication that she probably still lives with her parents and she is 31 [*sic*] years old. So I had concerns about taking grown-up responsibilities with that answer.

Augmented Reporter's Transcript ("ART") at 286.

The prosecutor did not question T.M. about her N/A response, which could indicate a possibility of pretext. See, e.g., Ex Parte Travis, 776 So.2d 874, 881 (Ala. 2000) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination"). On the other hand, this is not a case in which the prosecutor failed to engage in *any* meaningful voir dire of the excused juror. Cf. United States v. Esparza-Gonzalez, 422 F.3d 897, 905 (9th Cir. 2005) (the fact that the prosecutor waived any questioning of the jurors provided support for an inference of intentional discrimination); Fernandez v. Roe, 286 F.3d 1073, 1079 (9th Cir. 2002) (relying partly on the fact that the "prosecutor failed to engage in meaningful questioning of any of the minority jurors" to establish a prima facie case). And, importantly, while the prosecutor stated he "had concerns" about T.M.'s response in this regard (ART at 286), his primary indicated reason for exercising a challenge against T.M. was something else: "her case in suing an employer and going all the way through trial," a topic about which the prosecutor did question T.M. (ART at 218-19).

Of the twelve accepted jurors, nine indicated that they owned their home and the remaining three indicated that they rented their home. SCT at 4, 17, 32, 47, 62, 77, 92, 107, 122, 137, 152, 167. Thus, no other juror responded N/A to this question and a comparative juror analysis gives no indicia of pretext. See Cook, supra. The prosecutor's instinctive assessment

about T.M.'s predisposition based on the fact that she neither rented nor owned her home is an example of a subjective factor that can play a legitimate role in jury selection.  See Burks v. Borg, 27 F.3d 1424, 1429 (9th Cir. 1994) (explaining that in the absence of strong objective evidence of discrimination, reliance on such factors is proper), cert. denied, 115 S. Ct. 1122 (1995).  Considering the totality of circumstances in this case, a reasonable argument exists that this proffered reason was not pretextual.

### 2. Question Left Blank

T.M. left blank a single question on her juror questionnaire, the one which asked "Do you believe that it is possible that a defendant charged with a crime might not tell the truth?" CST at 432.  The prosecutor stated, as to this reason:

> And then on page 12, after having [the concern about her brother's drug possession conviction], I got to the packet on witness credibility where she didn't answer, if you believe it's possible the defendant charged with a crime might not tell the truth.  And I didn't see any other questions that she had missed.

ART at 286.

Petitioner's attorney opined in response to the prosecutor's explanation that it appeared T.M. inadvertently left the question blank and further noted T.M. indicated her agreement with the statement on the following page that "it is possible for any witness to swear to tell the truth and yet lie under oath[.]" CST at 433; ART at 288.  In explanation to this latter question, T.M. wrote "There are a number of reasons why I feel this way. I feel that there are some people who do not take the oath in a serious manner." CST at 433.  T.M. also indicated she believed she was a good judge of a person's honesty or credibility, and wrote in explanation "I feel I am well rounded, well traveled and experienced with dealing w/ multiple types of people on various levels.  I believe being open minded helps me adhere to a persons [sic] credibility & honesty." CST at 434.  The prosecutor did not question T.M. about her blank response to this particular question, which could have resolved the issue entirely.

////

In comparison, accepted jurors 2-12 all responded "yes" to this question, and wrote in explanations for their affirmative answer.[3] SCT at 28, 43, 58, 73, 88, 103, 118, 133, 148, 163, 178. Also of note is that juror number 5 left blank a different question which asked "Is there any reason you cannot be fair to all sides in this case?" CST at 76. Juror number 5 explained that the omission was inadvertent when petitioner's attorney asked about the omission. ART at 302.

It is somewhat unconvincing that T.M.'s blank response to this particular question was truly concerning to the prosecutor regarding her ability to serve as a fairminded juror. As set forth, T.M. agreed that any witness could swear to tell the truth and yet lie under oath; this would of course include a defendant. Petitioner's attorney argued that her responses to two other questions evidenced a "pro law enforcement" stance. ART at 288. In particular, T.M. indicated she agreed with, and would follow a law that "says a perpetrator who kills a victim during the course of a robbery, even if the killing was an accident, is guilty of murder"; and another that says "those who aid and abet the commission or attempted commission of the crime" are equally guilty of a crime as other principles. CST at 434. While these responses are not necessarily "pro law enforcement," neither are they "pro-defense." Most importantly, it seems possible that T.M. inadvertently failed to respond to the question at issue, which was the last question on the page. On this record, the prosecutor's second stated reason for excusing T.M. gives some evidence suggesting pretext.

3.     Previous Litigation

The prosecutor asked a prospective panel of jurors including T.M.: "Has... anybody here... had to testify in court or in a deposition or anything like that?" ART at 218. T.M. responded yes, and the following exchange occurred:

////

---

[3] Because two pages of juror number one's questionnaire are inexplicably missing from the record, it is not apparent how juror number one responded to this question. CST at 13-14.

| | | |
|---|---|---|
| 1 | [PROS.:] | Okay. How many times have you had to testify? |
| 2 | [T.M.:] | Once. |
| 3 | [PROS.:] | And what were the circumstances of that? |
| 4 | [T.M.:] | It was for my case. I had a run-in with one of my employers and so I was suing the company. And so at the deposition and at the trial I testified. |
| 5 | | |
| 6 | [PROS.:] | So did it actually go through trial? |
| 7 | [T.M.:] | I'm sorry? |
| 8 | [PROS.:] | Did it go through trial or did you just have to testify at a deposition? |
| 9 | | |
| 10 | [T.M.:] | No, it went to trial. |
| 11 | [PROS.:] | And how did you feel about having to testify? |
| 12 | [T.M.:] | Well, I mean, I felt pretty good about it because it was my case. And I, you know, I was confident on everything that I said because it happened to me so... |
| 13 | | |
| 14 | [PROS.:] | And you weren't nervous at all? |
| 15 | [T.M.:] | Oh, absolutely. |
| 16 | [PROS.:] | Okay. |
| 17 | [T.M.:] | Absolutely. |
| 18 | [PROS.:] | That's what I'm trying to kind of find out. |
| 19 | [T.M.:] | Sure. |
| 20 | [PROS.:] | What do you think caused you to be nervous? |
| 21 | [T.M.:] | Just re-living everything that I had went through and having to present all my personal information to people I had no idea about. |
| 22 | | |
| 23 | [PROS.:] | Yeah, who you were? |
| 24 | [T.M.:] | Right. |
| 25 | [PROS.:] | Thank you. |
| 26 | ART at 218-19. | |

The prosecutor explained, as to this proffered reason:

> [L]astly, when we were asking her questions, she said that she sued her employer and taken [*sic*] her case to trial. My feelings, this would cause her to have a natural empathy with people who want to take their case all the way through trial.
>
> And probably more than anything, based on – based on that concern about her taking her own case in suing an employer and going all the way through trial, I just didn't feel that she would be the best juror for my case.

ART at 286-87.

The prosecutor similarly questioned other panels of prospective jurors about their experiences testifying in court or depositions, indicating this was an issue of importance to him. ART 218-26, 336-37, 793. In comparison, none of the accepted jurors reported that they had previously testified as plaintiffs in civil cases or brought a case to trial as a plaintiff.

The trial court specifically credited this proffered reason and the state court held that T.M.'s perceived "empathy with people who want to take their cases all the way through trial" was a valid and nondiscriminatory reason for the prosecutor to exercise a peremptory challenge. Ex. A at 24. As set forth, "[p]eremptory challenges are a legitimate means for counsel to act on... hunches and suspicions." See Burks, 27 F.3d at 1429 n.3; see also J.E.B. v. Alabama ex. rel. T.B., 114 S. Ct. 1419, 1431 (1994) (O'Connor, J., concurring) ("[A] trial lawyer's judgments about a juror's sympathies are sometimes based on experienced hunches and educated guesses... That a trial lawyer's instinctive assessment of a juror's predisposition cannot meet the high standards of a challenge for cause does not mean that the lawyer's instinct is erroneous."). Under AEDPA, this state court determination is entitled to deference. That is, it cannot be said that there is no possibility that "fairminded jurists could disagree" on its correctness based on the record. See Richter, 131 S. Ct. at 786. Accordingly, this proffered reason gives no evidence of pretext.

////

////

### 4. Brother's Drug Possession Conviction

T.M. wrote on her questionnaire that her brother had been arrested for drug possession. She was unsure of the approximate year of the arrest or the circumstances, but wrote that the final outcome was "probation." CST at 426. The prosecutor stated, as to this proffered reason:

> [S]he said that she had a brother that had a conviction for drug possession. And this matter involves drugs and people who might have possessed drugs. So I was concerned about her ability to be fair based on her family history.

ART at 286.

In comparison, some of the jurors who were selected to serve had family members with previous arrests or had been arrested themselves, though none of the reported arrests were for drug possession. In this regard, jurors three, six, eight, ten, and eleven reported no previous arrests of themselves or any relatives. CST at 37, 82, 112, 142, 157. Juror number one reported a cousin who was arrested for sodomy/rape (CST at 9); juror number two reported two sons who had been arrested for domestic violence (CST at 22); juror number four reported a daughter with an unknown arrest (CST at 52); juror number five reported a husband with a DUI arrest and a cousin who had been arrested and convicted of murder (CST at 67); juror number seven had been arrested for DUI (CST at 97); juror number nine reported a husband with a DUI arrest (CST at 127); and finally, juror number twelve reported son with a DUI arrest and a brother who was arrested for theft (CST at 172).

A proper reason supporting a peremptory challenge must be "related to the particular case to be tried." Batson, 476 U.S. at 98. The prosecutor's proffered reason of a drug related arrest in T.M.'s family history is sufficiently related since the case to be tried involved drugs. On the other hand, the case was actually a murder case and juror number five reported a cousin who had been convicted of murder. While the circumstances presented by T.M. and juror number five are not identical, it must be remembered that "[a] *per se* rule that a defendant cannot

15

win a Batson claim unless there is an exactly identical white juror would leave Batson inoperable." See Miller-El, 545 U.S. at 247 n.6. Unfortunately, the alleged similarity between T.M. and juror number five was not raised at trial such that the prosecutor had a chance to explain why he exercised a peremptory challenge to T.M. but not as to juror five. The Supreme Court has recognized that a retrospective comparison of jurors based on a cold appellate record can be misleading when the alleged similarities were not raised at trial. Snyder v. Louisiana, 552 U.S. 472, 483 (2008). In such a situation, "an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." Id.

"[W]hen illegitimate grounds like race are in issue, a prosecutor has simply got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." Miller-El, 545 U.S. at 252. This proffered reason presents a closer call. This court, however, is bound by the constraint of AEDPA. The trial court accepted the prosecutor's explanation and found that this proffered reason was race neutral (ART at 289-90), and the state appellate court agreed it was a valid, nondiscriminatory reasons for exercising a peremptory challenge against T.M.. Ex. A at 24. On the record and circumstances present, this state court determination of fact is reasonable and is entitled to deference. See Richter, 131 S. Ct. at 786. Accordingly, this fourth and final proffered reason provides no evidence of pretext.

### 5. Summary and Conclusion

In sum, only one of the four proffered non-racial reasons of the prosecutor for striking T.M. gives some indicia of pretext. Petitioner has not met his burden of persuading the court that the prosecutor "was 'motivated in substantial part by discriminatory intent,'" Cook, 593 F.3d at 815, nor has he demonstrated that the state court's rejection of his Batson claim is based on an unreasonable determination of the facts in light of the evidence presented. That "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility" does not suffice to supercede the trial court's credibility determination on habeas corpus review. Rice,

16

546 U.S. at 341-42.  The evidence here is simply not "too powerful to conclude anything but" the contrary of the state court's determination.  See Miller-El, 545 U.S. at 265.  For these reasons, petitioner's Batson claim should be denied.

CONCLUSION

For the foregoing reasons, petitioner's application for writ of habeas corpus should be denied.  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either issue a certificate of appealability or must state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).  For the reasons set forth herein, petitioner has not made a substantial showing of the denial of a constitutional right.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's Batson claim be denied; and

2. The district court decline to issue a certificate of appealability as to any claim raised in the petition.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The

////

////

////

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 16, 2013

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

12
jone3154.batson